**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ANTONIO GARRETT,

       Petitioner,

v.                                                    Case No. 3:19-cv-71-TJC-JBT

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

       Respondents.

_____

## <u>ORDER</u>

### I.  <u>Status</u>

Petitioner, Antonio Garrett, an inmate of the Florida penal system, initiated this action by filing a pro se Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (Doc. 1) and a Memorandum of Law (Doc. 2) in support of his Petition. He challenges a state court (Duval County, Florida) judgment of conviction for first degree murder and possession of a firearm by a convicted felon. Petitioner is serving a cumulative life term of incarceration with a twenty-five-year minimum mandatory term. Respondents filed a Response. <u>See</u> Doc. 9 (Resp.).[1] And Petitioner replied. <u>See</u> Doc. 11. With

---

[1] Attached to the Response are several exhibits. The Court cites the exhibits as "Resp. Ex."

the Court's permission, Petitioner, with help from newly retained counsel, filed a Supplemental Memorandum of Law in support of his Petition. See Doc. 21. Respondents filed a Supplemental Response (Doc. 22), and Petitioner filed a Supplemental Reply (Doc. 25). This case is ripe for review.

## II.   **Factual and Procedural History**

For context, the Court summarizes only the factual and procedural history material to the claims. In 2013, Petitioner shot and killed Jerry Ford. Petitioner has maintained that he acted in self-defense when he committed the acts. Following the shooting, the state charged Petitioner with first degree murder (count one) and possession of a firearm by a convicted felon (count two). Resp. Ex. B at 5. Prior to jury selection, the parties and the trial court agreed that the jury would first hear evidence and make a finding on count one, and if the jury found Petitioner possessed a firearm during the commission of count one, only then would the jury hear instructions and make a finding on count two. Id.

At trial, Mellissa Summers testified that at the time of the incident, she was living with Ford. Id. at 232-33. According to Summers, on the day of the shooting, she and Ford spent the afternoon at a neighborhood party. Id. at 236. Summers testified that around midnight, she returned home from the party to find Ford sitting on their front porch talking to Petitioner. Id. at 241. Summers explained that Ford and Petitioner were friends, but on this evening, when she

2

arrived home, Ford and Petitioner appeared to be in a confrontation and at one point, Ford softly pushed Petitioner near the sidewalk in front of their home. <u>Id.</u> at 250. According to Summers, after Ford pushed Petitioner, Petitioner began walking away, and Ford told Summers to go inside. <u>Id</u> at 242, 248. Because Petitioner left, Summers went inside; however, about thirty minutes later, she heard five gunshots and immediately ran out of the house to find Ford's body lying on the other side of their duplex. <u>Id.</u> at 242. Summers ran to neighbor Ruth Brown's home where someone contacted the police. <u>Id.</u> at 243-44.

Anthony Kimble testified at trial that he knew Ford and Petitioner for about thirty years as they all lived in the same neighborhood. <u>Id.</u> at 253-54. Kimble stated that on the day of the shooting, he was also at the neighborhood party. <u>Id.</u> at 257. Kimble testified that later that night, he was sitting on his front porch and saw Petitioner walk by holding what looked like a black 9mm handgun behind his back. <u>Id.</u> at 254, 258. Kimble asked Petitioner where he was going, but Petitioner did not respond. <u>Id.</u> at 255. According to Kimble, Petitioner continued walking down the sidewalk, stopped at the front gate of Ford's house, and fired the gun towards Ford's front porch. <u>Id.</u> When Petitioner opened fire, Kimble saw Ford sitting in a chair on his front porch. <u>Id.</u> at 259. Kimble did not see whether Ford had anything in his hands when Petitioner began shooting. <u>Id.</u> After Kimble heard the first gunshot, he saw Ford fall over

3

the banister onto the porch of the abandoned duplex next door and attempt to get up on his knees before staggering back down and calling for help. Id. According to Kimble, after Petitioner shot Ford, Petitioner walked back down the sidewalk towards Kimble, and Kimble heard Petitioner say, "I told you about f**king with me [ ]." Id. at 261. Kimble explained that earlier that day, when the sun was still out, he witnessed Petitioner and Ford arguing about another individual urinating in Ford's yard. Id. at 267. Kimble, however, clarified that the shooting occurred after dark, and that he did not hear or witness any confrontation between Petitioner and Ford in the thirty minutes prior to the shooting. Id. at 267. Kimble also testified that he did not see any guns in Ford's yard at any time before or after the shooting. Id. at 268.

Onell Herrin, Kimble's wife, testified that she knew Ford and Petitioner for about one to two years, and stated she also attended the neighborhood party the night of the shooting. Id. at 271-75. According to Herrin, after the party, she was sitting on her porch with her husband when she saw Petitioner walking down the sidewalk toward Ford's duplex. Id. at 277-78. Herrin explained that when Petitioner walked by, she could see that Petitioner was holding an object in his hand, but since he was concealing the object behind his back, she could not see what the object was. Id. at 278. Herrin explained that at that time, Ford was sitting on his own front porch, and once Petitioner reached the front of Ford's yard, Herrin heard about six gunshots. Id. Herrin testified that "it was a

4

little, small [amount of] time" between seeing Petitioner walk by her house to when she heard the first gunshot. Id. Herrin stated that when she heard the shots, she immediately got down and once the shots stopped, she stood back up and saw Petitioner walk back past her home carrying a gun. Id. at 279. Herrin stated that she heard Petitioner state, "I told you about f***ing with me." Id. Herrin then called 911. Herrin explained that earlier that day, she saw Ford and Petitioner engage in a "loud" discussion, but she did not see them talking later that evening and she never saw a confrontation that involved pushing or shoving. Id. at 291, 294.

Officer Andre Durham testified that he was the first officer to arrive on scene. Id. at 289-300. According to Durham, when he arrived, he found Ford lying in the fetal position on the porch of a vacant duplex. Id. at 300. Because the gate to the vacant duplex was locked, Durham had to jump the fence to reach Ford. Id. He noticed multiple shell casings from fired gunshot rounds and observed firearms leaning against a fence. Id. at 301-03. Fire and rescue then transported Ford to the hospital where he was pronounced dead. Id. at 317. Detective Anthony Dziergowski, the evidence technician, testified he collected seven .45-caliber shell casings when processing the crime scene and no other types of shell casings were recovered or found. Id. at 371. He also testified that a BB gun and a .22-caliber rifle were found leaning against the fence. Id. at 358. Dziergowski stated that when he processed the .22-caliber rifle as evidence, the

5

gun was not loaded and no ammunition for that firearm was otherwise found at the scene. Id. at 370-73. He also explained that he was familiar with the type of .22-caliber rifle and that it is fired using a "bolt action." Id. at 382.

Doctor Aurelian Nicolaescu testified that he was the medical examiner who conducted an autopsy of Ford. Id. at 32 His major findings were three gunshot wounds: a fatal gunshot wound to Ford's back left flank, a gunshot wound to Ford's left buttock, and a gunshot wound to the back of Ford's left leg. Id. at 329, 332, 333. Nicolaescu also testified that he found no evidence of "soot, charring, or stippling" around the entrance wounds, suggesting more than two-to-three-feet of distance existed between Petitioner and Ford at the time of the shooting. Id. at 334. Nicolaescu stated that in his opinion, the cause of death was multiple gunshot wounds and the manner of death was homicide. Id. at 336.

Detective Erica Hill testified that she was the lead homicide detective investigating Ford's death. Id. at 400. According to Hill, when she arrived on scene, she spoke with Summers who advised Hill that Petitioner killed Ford. Id. at 409. Hill explained that officers arrested Petitioner, and Hill advised Petitioner of his constitutional rights before conducting an initial interrogation of Petitioner at the police department. Id. at 411-12. The state, over defense

counsel's objection, then presented a redacted video recording of Petitioner's interview.[2] Id. at 426-74.

During the police interview, Petitioner explained that he had been living in the abandoned duplex next door to Ford and on the night of the shooting, Ford and an unnamed individual with Petitioner began arguing after the individual openly urinated in the yard. Id. at 439-40. According to Petitioner, Ford then began arguing with Petitioner, so Petitioner asked Ford to "leave [him] alone" before walking away from Ford to "chill out." Id. at 440. Petitioner stated he then tried to avoid Ford by leaving the area and returning "five, six, seven times," each time making ten-to-fifteen-minute visits to the neighborhood party across the street. Id. at 441, 470. Petitioner stated he returned at some point and stood on the sidewalk outside Ford's house. Id. at 441-49. He explained that Ford went inside to get his .22-caliber rifle, came back outside, walked to the sidewalk, and pointed the rifle at Petitioner. Id. at 447. According to Petitioner, Petitioner then pulled out his own gun from his waistband, so Ford turned around and began running back up his porch stairs into his house; but because Ford cocked his rifle as he was running, Petitioner began shooting at Ford. Id. at 447-49. Petitioner explained that after he fired his first shot, Ford dropped his rifle and Petitioner continued to shoot at Ford. Id. at 449-50.

---

[2] Trial counsel objected to the state's redacted video recording under "the rule of completeness." Resp. Ex. B at 416.

Petitioner stated he shot seven or eight rounds and then walked away. Id. at 450. Petitioner knew at least one shot hit Ford in the back. Id. at 453.

Hill testified that during the interview, Petitioner never suggested that Ford threatened him. Id. at 482. Following Hill's testimony, and in compliance with the parties' agreement, the trial court read to the jury the parties' joint stipulation that Petitioner had "six previous felony convictions."[3] Id. at 482. Following the state's case-in-chief, Petitioner did not testify nor did he present any defense witnesses, rather he relied on the statements he made during the recorded interview to support his claim of self-defense.

During the charge conference, trial counsel requested modifications to the state's proposed jury instruction on justifiable use of deadly force. Id. at 525. A reading of the transcript suggests that trial counsel's modifications largely tracked Standard Jury Instruction 3.6(f), but trial counsel proposed that Petitioner reasonably believed deadly force was necessary to prevent the imminent commission of "first degree murder or aggravated battery" rather than "second degree murder." Id. at 528. The state agreed to the modification, but specifically asked that the trial court include with the common law instruction for the duty to retreat that "possession of a firearm by a convicted

---

[3] Before trial, the state and trial counsel agreed that if the state presented the video recording of Petitioner's police interrogation during trial, the trial court would read a joint stipulation that Petitioner had six prior felony convictions. Id. at 195.

felon constitutes unlawful activity," a provision included in the state's initial proposed instructions but excluded from trial counsel's proposal. Id. at 534-35. In support of the state's request, it cited Dorsey v. State, 74 So. 3d 521 (Fla. 4th DCA 2011). Id. at 536. In response, trial counsel objected and advised the trial court that she disagreed with the holding in Dorsey but understood it to mean that the state could request such instruction. Id. at 537, 544. The trial court then explained, "[s]ince it is the law and since I'm instructing them on the law[,] I'll go ahead and instruct it over your objection." Id. at 544.

During closing arguments, the state and trial counsel mostly focused their arguments on discrepancies in the evidence presented at trial. See generally id. at 555-99. At one point, the state argued that the jury should weigh the credibility of each witness who testified at trial and the credibility of the statements Petitioner made during his recorded interview. Id. at 558. It asserted that when conducting that evaluation, the jury "can take into consideration [Petitioner's] six prior felony convictions. . . ." Id. at 558. The state also made the following statement:

> [I]f you find that the defendant was engaged in an unlawful activity then he has a duty to retreat.
>
> And Judge Blazs is going to instruct you that possession of a firearm by a convicted felon is an unlawful activity. That's why you learned after Detective Hill testified that this defendant . . . is a six-time convicted felon.

Id. at 568-69. Trial counsel argued the following in pertinent part:

> [I]n deciding whether or not [Petitioner] was justified in the use of deadly force you must judge him by the circumstances by which he was surrounded at the time the force was used. The danger facing [Petitioner] need not have been actual to justify the use of deadly force[,] the appearance of danger must have been so real that a reasonable, cautious and prudent person under the same circumstances would have believed that the danger could be avoided only through the use of that deadly force.

Id. at 590-91. In rebuttal, the state argued that even if Petitioner's version of events were true, he cannot claim self-defense as he shot Ford in the back. Id. at 569. It then argued:

> Not only that, but this defendant had a duty to retreat which he did not do. Instead if Mr. Ford had a firearm and this defendant had pulled out his gun he had a duty to retreat. He wasn't at his own house. He was on the sidewalk. He had a duty to leave and he didn't.

Id. at 569-97.

After closing arguments, the trial court instructed the jury using the following language for justifiable use of deadly force:

> A person is justified in using deadly force if he reasonably believes that such force is necessary to prevent:
>
> 1. imminent death or great bodily harm to himself or another, or
>
> 2. the imminent commission of Attempted Murder in the Second Degree and/or Aggravated Battery, against himself or another.

10

In deciding whether Antonio Garrett was justified in the use of deadly force, you must judge him by the circumstances by which he was surrounded at the time the force was used. The danger facing Antonio Garrett need not have been actual; however, to justify the use of deadly force, the appearance of danger must have been so real that a reasonably cautious and prudent person under the same circumstances would have believed that the danger could be avoided only through the use of that force. Based upon appearances, Antonio Garrett must have actually believed that the danger was real.

If Antonio Garrett was not engaged in an unlawful activity and was attacked in any place where he had a right to be, he had no duty to retreat and had the right to stand his ground and meet force with force, including deadly force, if he reasonably believed that it was necessary to do so to prevent death or great bodily harm to himself or to prevent the commission of a forcible felony.

However, if you find that Antonio Garrett was engaging in unlawful activity then you must consider if Antonio Garrett had a duty to retreat.

Antonio Garrett cannot justify the use of force likely to cause death or great bodily harm unless he used every available means within his power and consistent with his own safety to avoid the danger before resorting to that force. The fact that Antonio Garrett was wrongfully attacked cannot justify his use of force likely to cause death or great bodily harm if, by retreating, he could have avoided the use of that force. However, if Antonio Garrett was placed in a position of imminent danger of death or great bodily harm and it would have increased his own danger to retreat then his use of force likely to cause death or great bodily harm was justifiable.

> Possession of a firearm by a convicted felon constitutes unlawful activity.

Resp. Ex. A at 106-07.

The jury found Petitioner guilty of first degree murder, with the special finding that Petitioner possessed and discharged a firearm during the commission of the offense. Resp. Ex. B at 640. Following the jury verdict on count one, the trial court instructed the jury on possession of a firearm by a convicted felon, a charge for which the jury also found Petitioner guilty. Id. at 642-55.

Petitioner, with help from appellate counsel, sought a direct appeal. And as his sole issue on appeal, Petitioner argued that the trial court erred when it included in its jury instruction on justifiable use of deadly force that possession of a firearm by a convicted felon constituted unlawful activity, because it required the jury to consider whether Petitioner had a duty to retreat. Resp. Ex. C. The state filed an answer brief addressing the claim on the merits. Resp. Ex. D. The First District Court of Appeal issued a written opinion affirming Petitioner's judgment of conviction. Resp. Ex. E; see also Garrett v. State, 148 So. 3d 466 (Fla. 1st DCA 2014). Because trial counsel failed to raise this specific legal argument or ground during the charge conference or otherwise at trial, the First DCA found that Petitioner did not preserve the issue for appellate review and reviewed the claim for fundamental error. Garrett, 148 So. 3d at

469. In doing so, the appellate court found that the trial court erred in instructing the jury about Petitioner's unlawful possession of a firearm in relation to his claim of self-defense, but found that such error did not reach down into the validity of the trial so as to render it fundamentally unfair. Id. at 471. The First DCA explained:

> According to Garrett's version of events, Ford was armed with a .22-caliber long rifle and had just pointed it at Garrett. Garrett pulled out his own gun and fired it in Ford's direction as Ford ran off while trying to cock his weapon. To prevail on his claim of self-defense, Garrett needed to establish that he had a reasonable belief that his use of deadly force was necessary to prevent the imminent danger presented by Ford. While the improper instruction required the jury to consider whether Garrett had a duty to retreat, the jury was also instructed that if Garrett "was placed in a position of <u>imminent</u> danger of death or great bodily harm and it would have increased his own danger to retreat then his use of force likely to cause death or great bodily harm was justifiable." (emphasis added).
>
> Under the complete set of instructions given, the jury could have found that Garrett's use of deadly force was justified and he had no duty to retreat because retreating would be futile given the "imminence" of the danger he faced. Although the challenged sentence in the instruction raised a "duty to retreat" question, in considering the effect of the instruction in the context of the other instructions given, along with the evidence adduced in the case, we find that the jury was sufficiently instructed on Garrett's theory of self-defense. There was ample evidence presented for the jury to find that from the beginning of the incident, Garrett did not have a reasonable belief that deadly force was necessary to prevent an imminent threat against him, especially after Ford dropped his rifle and

> Garrett continued to shoot. That the jury ultimately rejected Garrett's claim of self-defense does not mean that the challenged instruction constituted fundamental error.
>
> . . . .
>
> The erroneous instruction did not affect the jury's ultimate responsibility to determine whether the threat faced by Garrett was imminent, in which case retreat would be futile and his use of deadly force would be justified, irrespective of whether he was engaged in unlawful activity at the time. Finding no fundamental error, we affirm the conviction and sentence.

<u>Id.</u> at 471-72. Petitioner, with help from counsel, sought discretionary jurisdiction with the Florida Supreme Court, requesting that the court resolve an inter-district conflict on whether fundamental error results from an erroneous instruction that a person engaged in illegal activity has a duty to retreat. Resp. Exs. I, J. The Florida Supreme Court first accepted jurisdiction,

but after merits briefing and oral argument, the court discharged jurisdiction and dismissed review.[4] Resp. Ex. L-W.

Petitioner then filed a pro se Florida Rule of Criminal Procedure 3.850 motion for postconviction relief raising one ground: ineffective assistance of trial counsel for failing object to the trial court's erroneous jury instruction on justifiable use of deadly force. Resp. Ex. Y at 1-11. After directing the state to respond, the trial court denied Petitioner's Rule 3.850 motion on the merits. Id. at 813. The First DCA per curiam affirmed the trial court's denial without a written opinion. Resp. Ex. CC. The Petition followed.

---

[4] The Court notes that the Honorable Barbara Pariente wrote a dissent to the majority's opinion, explaining "that the jury instruction given on justifiable use of deadly force was fundamentally erroneous, and because ineffectiveness of counsel appears on the face of the record, I would quash the decision in Garrett v. State, 148 So.3d 466 (Fla. 1st DCA 2014), consistent with the approach of the Second District in Dooley v. State, [198 So. 3d 850 (Fla. 2d DCA 2016)]" (Dooley I). Garrett v. State, 192 So. 3d 470 (Fla. 2016) (Pariente, J., dissenting). In Dooley I, the Second DCA found that Dooley's appellate counsel was ineffective for failing to argue on direct appeal that the trial court's instruction on justifiable use of deadly force erroneously conditioned "stand your ground immunity on whether the defendant was engaged in unlawful activity." Dooley, 198 So. 3d at 850. Considering appellate counsel's error, the court reversed Dooley's conviction and remanded for a new trial. Id. About six months later, however, the Second DCA withdrew its opinion in Dooley I for its superseding opinion in Dooley v. State, 206 So. 3d 87 (Fla. 2d DCA 2016) (Dooley II). In Dooley II, the court maintained that appellate counsel was ineffective, but rather than remanding for a new trial, the court ordered that Dooley be afforded a new direct appeal solely on whether the erroneous jury instruction amounted to fundamental error. Id. at 87-89.

## III.   Governing Legal Principles

### A. Standard Under AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016), cert. denied, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. See Marshall v. Sec'y Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or

16

argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. [at 102] (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear

> error) with unreasonableness."); <u>Williams v. Taylor</u>,
> 529 U.S. 362, 410 (2000) ("[A]n unreasonable
> application of federal law is different from an incorrect
> application of federal law.").

<u>Bishop v. Warden, GDCP</u>, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal

citations modified).

## B. Exhaustion and Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254

habeas action in federal court, a petitioner must exhaust all state court

remedies available for challenging his state conviction. <u>See</u> 28 U.S.C. §

2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]"

every issue raised in his federal petition to the state's highest court, either on

direct appeal or on collateral review. <u>Castille v. Peoples</u>, 489 U.S. 346, 351

(1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners

must give the state courts one full opportunity to resolve any constitutional

issues by invoking one complete round of the State's established appellate

review process." <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999); <u>see also</u> <u>Pope</u>

<u>v. Rich</u>, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that <u>Boerckel</u> applies to the

state collateral review process as well as the direct appeal process.").

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state
> prisoner must exhaust available state remedies, 28
> U.S.C. § 2254(b)(1), thereby giving the State the
> ""opportunity to pass upon and correct" alleged

18

> violations of its prisoners' federal rights.'" <u>Duncan v. Henry</u>, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. <u>Duncan</u>, <u>supra</u>, at 365-366, 115 S. Ct. 887; <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999).

<u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. <u>See</u>, <u>e.g.</u>, <u>Coleman</u>,[5] <u>supra</u>, at 747–748, 111 S. Ct. 2546; <u>Sykes</u>,[6] <u>supra</u>, at 84–85, 97 S. Ct. 2497. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the

---

[5] <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991).

[6] <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977).

> claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. <u>See</u>, <u>e.g.</u>, <u>Walker v. Martin</u>, 562 U.S. --, --, 131 S. Ct. 1120, 1127–1128, 179 L.Ed.2d 62 (2011); <u>Beard v. Kindler</u>, 558 U.S. --, --, 130 S. Ct. 612, 617–618, 175 L.Ed.2d 417 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. <u>See</u> <u>Coleman</u>, 501 U.S., at 750, 111 S. Ct. 2546.

<u>Martinez v. Ryan</u>, 566 U.S. 1, 9-10 (2012). Thus, procedural defaults may be excused under certain circumstances. Even though a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. <u>Ward v. Hall</u>, 592 F.3d 1144, 1157 (11th Cir. 2010). For a petitioner to establish cause and prejudice,

> the procedural default "must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct." <u>McCoy v. Newsome</u>, 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting <u>Carrier</u>, 477 U.S. at 488, 106 S. Ct. 2639).[7] Under the prejudice prong, [a petitioner] must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." <u>Id.</u> at 1261 (quoting <u>Carrier</u>, 477 U.S. at 494, 106 S. Ct. 2639).

<u>Wright v. Hopper</u>, 169 F.3d 695, 706 (11th Cir. 1999).

---

[7] <u>Murray v. Carrier</u>, 477 U.S. 478 (1986).

Without a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Carrier, 477 U.S. at 496, 106 S. Ct. at 2649. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001).

Ward, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. Schlup, 513 U.S. at 324.

### C. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003), and Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. Strickland, 466 U.S. at 687.

There is no "iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir. 2010). Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

Further, "[t]he question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard," then a federal court may not disturb a state-court decision denying the claim. <u>Richter</u>, 562 U.S. at 105. As such, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" <u>Daniel v. Comm'r, Ala. Dep't of Corr.</u>, 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting <u>Strickland</u>, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." <u>Id.</u> (citing <u>Richter</u>, 562 U.S. at 105); <u>see also</u> <u>Evans v. Sec'y, Dep't of Corr.</u>, 703 F.3d 1316, 1333-35 (11th Cir. 2013) (en banc) (Jordan, J., concurring); <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1309 (11th Cir. 2004).

IV. <u>Analysis</u>[8]

A. Ground One

Petitioner argues that the trial court erred in reading an erroneous and misleading jury instruction that negated his sole defense at trial. Doc. 1 at 6-16. Petitioner contends that the trial court incorrectly instructed the jury that because Petitioner was engaged in an unlawful activity – possession of a firearm by a convicted felon – at the time of the incident, the jury must consider whether Petitioner had a duty to retreat before using deadly force. He contends that the trial court's error undermined the jury's guilty verdict and violated his rights under the Sixth and Fourteenth Amendments.

Respondents argue that this claim is unexhausted and procedurally defaulted because when he raised the issue during his direct appeal, Petitioner did not present the federal nature of this claim to the state court. Resp. at 21-24. Petitioner concedes that this claim is unexhausted as he "did not effectively assert any federal constitutional claims in the state court relevant to this claim," but requests that the Court excuse the procedural default under the purviews of <u>Martinez</u> and <u>Trevino v. Thaler</u>, 133 S. Ct. 1911 (2013), because "he was denied effective assistance of trial counsel at trial and denied any counsel

---

[8] When summarizing Petitioner's allegations and Respondents' responses, the Court reads and considers, in concert, the corresponding assertions in the Petition, Response, and supplemental briefing.

24

at his first collateral post conviction proceeding." Doc. 1 at 6 n.1; <u>see also</u> Doc. 21 at 13-14.

As mentioned, Petitioner raised this claim on direct appeal and sought discretionary review with the Florida Supreme Court. When briefing this issue in both state appellate courts, Petitioner did not state or suggest that it was a federal claim about due process or any other federal constitutional guarantee. Resp. Exs. C, M. Instead, Petitioner argued, in terms of state law only, that while the trial court's instruction may have been an accurate statement of the law for justifiable use of deadly force under § 776.013, Florida Statutes (2011), Petitioner relied on § 776.012(1) at trial to establish that his use of force was justified to prevent the imminent commission of a forcible felony: Ford's attempted second degree murder or aggravated battery. And, according to Petitioner, the version of § 776.012(1) in effect at the time of the 2011 shooting did not impose a duty to retreat, regardless of Petitioner's unlawful possession of a firearm during the incident. Resp. Ex. C at 11-13 (citing <u>State v. Hill</u>, 95 So. 3d 434 (Fla. 4th DCA 2012); <u>Dorsey v. State</u>, 74 So. 3d 521 (Fla. 4th DCA 2011); <u>Little v. State</u>, 111 So. 3d 214 (Fla. 2d DCA 2013)). The First DCA then analyzed Petitioner's claim as an issue of fundamental error. Resp. Ex. E. And "fundamental error is an issue of state law, and state law is what the state courts say it is." <u>Pinkney v. Sec'y, DOC</u>, 876 F.3d 1290, 1299 (11th Cir. 2017).

When briefing this issue for the Florida Supreme Court's discretionary review, Petitioner asserted that: (1) there was an inter-district conflict between the First and Fourth DCAs' application of assessing the effect of a flawed jury instruction for § 776.021(1); (2) the First DCA assumed the jury's role when it decided that the evidence suggested no juror would have found Petitioner was in "imminent danger" as required in § 776.012(1); and (3) the First DCA failed to correctly apply the fundamental error test outlined in Martinez v. State, 981 So. 2d 449 (Fla. 2009). Resp. Ex. M. Although Petitioner referenced the "federal constitutional right[] to trial by jury," Petitioner failed to articulate and fairly present a federal constitutional claim. Id. at 15. Merely referencing the United States Constitution cannot exhaust the federal claim in state court. Rather, this claim involves statutory interpretation of a state law by state courts, not a claim of federal constitutional dimension.

Also, Petitioner cannot rely on the Martinez or Trevino exception to establish "cause" for his procedural default. Martinez and Trevino only apply to procedurally defaulted claims of ineffective assistance of trial counsel. See Gore v. Crews, 720 F.3d 811, 816 (11th Cir. 2013) (providing that "[b]y its own emphatic terms, the Supreme Court's decision in Martinez is limited to claims of ineffective assistance of trial counsel that are otherwise procedurally barred due to the ineffective assistance of post-conviction counsel"). And thus Petitioner cannot rely on the Martinez/Trevino exception to overcome the

procedural default of his trial court error claim. See Davila v. Davis, 137 S. Ct. 2058, 2065-66 (2017) (declining to extend Martinez to procedurally defaulted claims of ineffective assistance of appellate counsel). This claim is unexhausted and procedurally defaulted, and Petitioner has failed to show cause for or prejudice from this procedural bar. And he has not identified any fact warranting the application of the fundamental miscarriage of justice exception. Ground One is due to be denied.

**B. Ground Two**

Petitioner contends his trial counsel was ineffective for failing to adequately object and challenge the misleading jury instruction on justifiable use of deadly force. Doc. 1 at 19-21; Doc. 21 at 11. He contends that trial counsel's proposed instructions, which the trial court adopted, "was an amalgam of the law of self-defense under both § 776.012 and § 776.013." Doc. 21 at 2. As stated, his self-defense theory at trial arose under only § 776.012, which at the time of his trial contained no duty to retreat regardless of Petitioner's unlawful activity.[9] In contrast, § 776.013(3), which Petitioner contends was a separate theory of self-defense inapplicable to Petitioner's case, contained a duty to retreat for those engaged in unlawful activity. Petitioner asserts that trial counsel, however, misunderstood the case law on justifiable

---

[9] In 2014, the legislature amended § 776.012 to include the "unlawful activity" preclusion contained in § 776.013(3). See Garrett, 148 So. 3d at 473 n2.

use of deadly force and specifically requested an instruction that blended the language of the applicable § 776.012 and the inapplicable § 776.013(3). Compounding this error, Petitioner contends that trial counsel did not adequately challenge the state's request to add the instruction that being a felon in possession of a firearm constituted unlawful activity, failing to recognize that <u>Dorsey</u>, the case on which the state relied to request the inclusion of such language, applied to jury instructions for the inapplicable § 776.013(3). Doc. 21 at 5. Likewise, Petitioner contends that trial counsel was ineffective for allowing the state to reinforce the instruction by arguing during closing that Petitioner had a duty to retreat. <u>Id.</u> at 8-10. And that trial counsel should not have stipulated that Petitioner was a six-time convicted felon or agreed that the trial court read the stipulation to the jury. <u>Id.</u>

Petitioner raised a version of this claim in his Rule 3.850 motion. Resp. Ex. Y at 1. The state responded to Petitioner's claim on the merits. <u>See generally</u> <u>id.</u> at 121-32. In its response, the state recognized the two-prong <u>Strickland</u> standard as controlling authority and argued this claim should be denied, because, <u>inter alia</u>, even if trial counsel was deficient for failing to object to the jury instruction, Petitioner cannot show the required prejudice. <u>Id.</u> at 127-32. The state explained:

> The First DCA's findings in Garret's case, on direct appeal, belie any notion that there is a reasonable probability of a different outcome.

28

To demonstrate <u>Strickland</u> prejudice, Garrett must demonstrate that counsel's failure to make a sufficient objection to the instructions probably affected the outcome. Logically, to do that, Garrett must[] first[] show that somehow he was deprived of his self-defense claim or that the jury was misled. But he wasn't deprived nor was the jury misled.

Indeed, the First [DCA], on direct appeal specifically found that[] "[w]hen the entirety of the jury instructions relating to Garrett's claim of self-defense are considered, the jury was not precluded from considering Garrett's affirmative defense, regardless of his unlawful activity." <u>Garrett</u>[], 148 So. 3d at 471. The Court went on to observe that Garrett's claim of self-defense turned on whether the evidence before the jury supported a reasonable belief that Garrett was under threat of imminent death or great bodily harm or the imminent commission of a forcible felony by Ford. The Court found that the "erroneous instruction did <u>not</u> (emphasis added) affect the jury's ultimate responsibility to determine whether the threat faced by Garrett was imminent, in which case retreat would be futile and his use of deadly force would be justified, irrespective of whether he was engaged in unlawful activity at the time. <u>Id.</u>

The record in this case bears out the First District's observations.

. . . .

In this case, Garrett is not prejudiced by his attorney failing to make an objection to this jury instruction on the legal basis he cites in his motion as the evidence clearly refutes any viable claim of self-defense. The jury in this case made their determination based on the evidence and testimony presented. The evidence presented in this case overwhelmingly supported the verdict. Furthermore as noted above, the

First District specifically found that the erroneous instructions did not mislead the jury into believing it could not find Garrett acted in self-defense if the evidence actually supported his claim of self-defense. Garrett[], 148 So. 3d [at] 471 [(]"under the complete set of jury instructions given, the jury was not precluded from excusing Garrett for his deadly act if it believed that the evidence supported his claim of self-defense."). Defense counsel was not barred from arguing Garrett's claim of self-defense which is exactly what they did throughout the entire trial and specifically closing arguments.

During closing arguments, defense counsel relied on the instruction regarding justifiable use of deadly force and argued that the jury should look at the relative physical ability and capabilities of both Garrett as well as the victim among other factors in deciding their verdict. (TR 586). Defense counsel highlighted parts of each of the witnesses' testimony and the pieces of physical evidence that suggested Garrett was acting in self-defense. Defense counsel made no mention of Garrett having a duty to retreat and argued that the victim had a gun and that Garrett did not know what the victim was going to do. (TR 588). Therefore, the jury was not precluded from considering Garrett's affirmative defense regardless of his unlawful activity. Garrett[], 148 So.3d [at] 471.

Resp. Ex. Y at 127-32. The trial court then denied Petitioner's Rule 3.850 motion, "incorporat[ing] by reference all exhibits and transcripts cited in the State's response" and concluding that "[u]pon review, the record refutes [Petitioner's] entitlement to relief." Id. at 813-14. Petitioner appealed, and the First DCA per curiam affirmed the trial court's denial without a written opinion. Resp. Ex. CC. Assuming the First DCA affirmed the denial on the

merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications.

In doing so, the Court heeds the First DCA's conclusion on Petitioner's direct appeal that it was error to include § 776.013(3)'s unlawful activity/duty to retreat analysis in the jury instruction for justifiable use of deadly force. As the First DCA explained in its opinion, when Petitioner committed the offenses in 2011, § 776.012 and § 776.013(3) contained subtle and important distinguishing characteristics – the former having, at that time, no duty to retreat regardless of unlawful activity – and because Petitioner presented evidence supporting a defense under § 776.012, he was entitled to receive an instruction that followed only the language of that statute. See Garrett, 148 So. 3d at 471 (citing Little v. State, 111 So. 3d 214 (Fla. 2d DCA 2013) (explaining at length the distinguishing characteristics of § 776.012 and § 776.013(3)). But when trial counsel presented her proposed jury instruction, the parties and the trial court did not have the benefit of the Second District Court of Appeal's decision in Little, the case on which the First DCA relied, because it was issued during the pendency of Petitioner's direct appeal; nor did they have guidance from the flurry of post-Little case law clarifying the distinct avenues of §

776.012 and § 776.013(3).[10] <u>See</u> <u>Dooley v. State</u>, 268 So. 3d 880, 887 (Fla. 2d DCA 2019) (collecting cases).

But of more import, the Court defers to the state postconviction court's conclusion that the erroneous jury instruction did not affect the outcome of Petitioner's trial; and thus in turn, Petitioner has failed to show prejudice under <u>Strickland</u>. While the improper instruction required the jury to consider if Petitioner had a duty to retreat, the trial court also instructed that Petitioner had no duty to retreat if the danger was so imminent that retreating would have been futile. Resp. Ex. A at 107. And any harmful effect from the state's closing arguments mentioning a duty to retreat and omitting the futility exception was diminished by the trial court's instruction that the attorneys' statements during closing are not evidence or the law, and thus should not be considered as such. Resp. Ex. B at 555.

Additionally, as the First DCA explained, "[t]here was ample evidence presented for the jury to find that from the beginning of the incident, [Petitioner] did not have a reasonable belief that deadly force was necessary to prevent an imminent threat against him . . . ." <u>Garrett</u>, 148 So. 3d at 471-72; <u>see</u> <u>supra</u> pg. 2-8. Considering the totality of the evidence, as well as the jury

---

[10] The trial court read the final jury instructions on February 14, 2013. Resp. Ex. A at 93. The Second DCA issued its opinion in <u>Little</u> on April 10, 2013. <u>Little</u>, 111 So. 3d at 214.

instructions as a whole, the jury was authorized to conclude that Petitioner was not justified in using deadly force.

As such, Petitioner cannot show that but for trial counsel's alleged error, the outcome of his trial would have been different. Under the deferential standard of AEDPA review, the state court's adjudication of this claim was neither contrary to nor an unreasonable application of Strickland, and it was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. See 28 U.S.C. § 2254(d). Ground Two is denied.

Accordingly, it is

**ORDERED AND ADJUDGED**:

1.     The Petition (Doc. 1) is **DENIED** and this case is **DISMISSED with prejudice**.

2.     The **Clerk of Court** shall enter judgment accordingly, terminate any pending motions, and close this case.

3.     If Petitioner appeals this Order, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending

motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[11]

**DONE AND ORDERED** at Jacksonville, Florida, this 13th day of January, 2022.



TIMOTHY J. CORRIGAN
United States District Judge

Jax-7

C:   Antonio Garrett, #045184
     counsel of record

---

[11] The Court should issue a certificate of appealability only if Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.